IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WICKES HOLDINGS, LLC and<br>WICKES FURNITURE COMPANY, INC.,<br><br>Debtors. | Chapter 11<br><br>Case No. 08-10212 (KJC)<br>(Jointly Administered)<br><br>Hearing Date: April 15, 2009 at 11:00 a.m. (ET)<br>Objection Deadline: April 8, 2009 at 4:00 p.m. (ET) |

## DEBTORS' MOTION, PURSUANT TO SECTIONS 105(a), 349 AND 1112(b) OF THE BANKRUPTCY CODE, FOR THE ENTRY OF AN ORDER (A) APPROVING PROCEDURES FOR (I) THE DISTRIBUTION OF TRUST FUNDS TO GENERAL UNSECURED CREDITORS AND (II) DISMISSING THE DEBTORS' CHAPTER 11 CASES; AND (B) GRANTING CERTAIN RELATED RELIEF

Wickes Holdings, LLC and Wickes Furniture Company, Inc., the debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), hereby submit this motion (the "**Motion**") requesting the entry of an Order, pursuant to sections 105(a), 349 and 1112(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), (a) approving procedures (collectively, the "**Distribution and Dismissal Procedures**") for (i) the resolution of all general unsecured claims against the Debtors and the distribution of funds held in trust for the benefit of general unsecured creditors and (ii) the dismissal of the Debtors' bankruptcy cases; and (b) granting certain related relief. In support of this Motion, the Debtors respectfully represent as follows:

## BACKGROUND

A. **The Chapter 11 Filings and Jurisdiction**

1. On February 3, 2008, each of the Debtors filed a petition for voluntary relief under chapter 11 of the Bankruptcy Code. By an Order entered on February 5, 2008, the Debtors' chapter 11 cases were consolidated for procedural purposes only and are being administered jointly [Docket No. 31].

2. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. On February 12, 2008, the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed an official committee of unsecured creditors in these cases (the "**Committee**") pursuant to section 1102 of the Bankruptcy Code.

4. This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## B. The DIP Facility

5. On February 4, 2008, the Debtors filed a motion for approval of a $30 million senior secured financing facility (the "**DIP Facility**") with Wells Fargo Retail Finance LLC, as collateral agent and administrative agent ("**Wells Fargo**" or the "**DIP Agent**"), and the lenders party thereto (collectively, the "**DIP Lenders**"). By an order dated March 28, 2008, this Court gave final approval to the DIP Facility (the "**DIP Order**") [Docket No. 513].

6. In the DIP Order, the Court determined that Wells Fargo has valid, binding, enforceable and perfected first-priority liens on substantially all of the Debtors' assets, senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates except as otherwise provided in the DIP Order.

## C. Asset Sales and Administration of the Estates

7. On February 28, 2008, the Court held a hearing to consider approval of a certain agency agreement (the "**Agency Agreement**") by and between the Debtors and a joint venture comprised of Hilco Merchant Resources, LLC, Tiger Capital Group, LLC, SB Capital

Group, LLC, and Planned Furniture Promotions, Inc. (the "**Joint Venture**"), whereby the Joint Venture was to act as the Debtors' exclusive agent for the limited purpose of selling inventory by conducting "going-out-of-business," "store closing," "bankruptcy," or similarly themed sales and disposing of the Debtors' owned furniture, trade fixtures and equipment. The Debtors selected the Joint Venture's bid, in the form of the Agency Agreement, as the highest and best bid at an auction held on February 25, 2008. On February 28, 2008, the Court entered an Order approving the Agency Agreement [Docket No. 321].

8. On March 5, 2008, the Debtors filed a Notice of Submission of Form of Stalking Horse Designation Rights Sale Agreement with attached form of Stalking Horse Designation Rights Sale Agreement (the "**Designation Rights Sale Agreement**") by and between the Debtors and a joint venture formed by Retail Consulting Services, Inc., d/b/a RCS Real Estate Advisors, Hudson Capital Partners, LLC, Crystal Capital Fund, LP, and Julius M. Feinblum Real Estate, Inc. (collectively, the "**Designation Rights Purchasers**") [Docket No. 358]. The Debtors held an auction of the right to direct and designate whether and to whom each of the Debtors' unexpired leases for nonresidential real property shall be assigned on March 10, 2008, at which the Designation Rights Purchasers were the successful bidder. The Court entered an Order approving the Designation Rights Sale Agreement at the hearing held on March 11, 2008 [Docket No. 415].

9. On April 10, 2008, the Court approved a stipulation and agreed order between the Debtors and Old Republic Insurance Company ("**Old Republic**"), pursuant to which the parties established certain terms governing the resolution of the Debtors' payment obligations to Old Republic under certain workers' compensation, employer's liability, business automobile

liability and excess commercial general liability insurance policies issued by Old Republic to the Debtors (the "**Insurance Stipulation**") [Docket No. 584].

10. As of June 30, 2008, the Joint Venture concluded all going-out-of-business sales at the Debtors' stores, clearance centers and distribution centers, and the Debtors closed all such locations. Thus, as of June 30, 2008, the Debtors no longer had any ongoing retail operations.

11. To date, the Debtors have rejected, assumed and assigned, or terminated all but one of their leases of non-residential real property. The only remaining lease of non-residential real property is for a property located in Merrillville, Indiana (the "**Merrillville Property**") and is the subject of an assumption motion [Docket No. 927] and adversary proceeding, which is currently pending before this Court as Case No. 08-51108. The parties to the adversary proceeding have reached a settlement whereby the leasehold interest in the Merrillville Property will be assigned to IMH Capital Corp. ("**IMH**"), as agent for the DIP Lenders. The Debtors are filing a motion to approve such settlement concurrently with this Motion. Under the terms of the settlement, IMH will market the leasehold interest in the Merrillville Property, which is expected to yield approximately $1 million in sale proceeds.

12. The Debtors owned real estate in Wheeling, Illinois (the "**Wheeling Property**") and held an auction at which the Wheeling Property was sold to the Village of Wheeling, an Illinois municipality, for a purchase price of $3,775,000. On November 18, 2008, the Court held a hearing to approve the sale, and the sale closed on December 17, 2008.

13. On January 23, 2009, the Debtors filed a motion for authorization to sell the Debtors' trade names to the Great American Group for a purchase price of $250,000 [Docket No. 1281].

14. The Committee has been pursuing various Avoidance Actions (as defined in the DIP Order). The Committee has reached settlements in several of the Avoidance Actions, and does not believe that pursuing the remaining litigation claims and preference actions would be cost-effective and generate additional value for the benefit of the estates.

15. The Debtors' remaining assets consist of miscellaneous causes of action. Wells Fargo, however, has a lien on such causes of action, and any amounts recovered would be payable to Wells Fargo. The Debtors have no remaining valuable assets that they or the Committee can liquidate in a cost-effective manner for the benefit of the estates.

16. The proceeds from the sale of the Debtors' various assets, including the anticipated sale of the Merrillville Property, are insufficient to satisfy all of the Debtors' remaining obligations to secured parties under the DIP Facility. Specifically, Wells Fargo continues to hold an unsatisfied claim of approximately $11,378,785 million under the DIP Facility. In addition, Ableco Finance LLC hold second-lien debt in the aggregate amount of approximately $45 million, and there is in excess of an estimated $3 million in administrative expenses chargeable to the estates.

### D. The General Unsecured Creditor Trust

17. As a result of negotiations with the Committee, Wells Fargo agreed to carve out certain funds that Wells Fargo otherwise would have been entitled to receive as a secured lender under the DIP Facility, as provided in the DIP Order. These funds have been held in a General Unsecured Creditors Trust (the "**GUC Trust**") for the benefit of general unsecured creditors. Paragraph 11 of the DIP Order identifies a range of sharing opportunities to fund the GUC Trust from proceeds that otherwise would be distributed to the DIP Agent and the DIP Lenders. As a result of these sharing opportunities, over the course of these cases the GUC Trust

has accumulated approximately $341,565 for the benefit of general unsecured creditors from preference recoveries (the "**GUC Funds**"). Had Wells Fargo not agreed to carve out the GUC Funds for the benefit of general unsecured creditors, the GUC Funds would have been payable to Wells Fargo.

18. The Debtors, in consultation with the Committee, have determined that no significant additional assets are or will be available to fund the GUC Trust, with the possible exception of certain proceeds from the anticipated sale of the Debtors' leasehold interest in the Merrillville Property. Pursuant to paragraph 11(b) of the DIP Order, up to $200,000 of the proceeds from the sale of the Debtors' leasehold interests shall be transferred to the GUC Trust once Wells Fargo has received the sum of $5.8 million in net proceeds from the sale of such interests. To date, Wells Fargo has received approximately $4.6 million in net proceeds, and the sale of the Debtors' leasehold interest in the Merrillville Property is expected to yield an additional $1 million in net proceeds.

19. The DIP Order also provided that the Committee had sole authority to prosecute and settle certain causes of action, including the Avoidance Actions and Insider Actions (as defined in the DIP Order), but specifically excluding the matters of *Wickes Furniture Company, Inc. v. Frank O'Connor*, Case No. 07 L 1412 in the Circuit Court of Cook County, Illinois, and *Wickes Furniture Company, Inc. v. Ira Carpman, et al.*, Case No. 06 CV 4862 in the U.S. District Court for the Northern District of Illinois (collectively, the "**Excluded Insider Actions**"). To date, the Committee has realized $341,565 in preference recoveries.

20. Among other things, the Committee reviewed prepetition payments to creditors and analyzed other potential litigation targets and concluded that there would be no substantial net benefit to general unsecured creditors to pursue additional preference claims or

other avoidance actions. Consequently, the Committee has determined—and the Debtors agree—that there are no material unencumbered funds to be obtained for the benefit of general unsecured creditors.

21. Based upon a review of Schedule F to each of the Debtors' schedules of assets and liabilities filed with the Court on March 10, 2008 (collectively, "**Schedule F**") [Docket Nos. 405 and 406], and the proofs of claim filed in these cases, the Debtors estimate that the general unsecured claims against the Debtors are approximately 7,492 in number and $78.3 million in amount.[1] Based on approximately $341,565 in current GUC Funds before expenses, the Debtors anticipate making a *pro rata* distribution of approximately 0.4%, or four-tenths of one percent, to general unsecured creditors.[2]

## RELIEF REQUESTED

### A. The Claims Resolution Process

22. As set forth above, the Debtors seek the entry of an order, among other things, approving procedures for the resolution of all general unsecured claims against the Debtors' estates (the "**Claims Resolution Process**"), which process (described below) will permit a *pro rata* distribution (the "**Distribution**") to holders of allowed general unsecured claims. To facilitate the Claims Resolution Process and the Distribution, the Debtors seek the appointment of Anthony C. Labrosciano as trustee of the GUC Trust (the "**GUC Trustee**"), pursuant to the terms of the proposed distribution order attached hereto as **Exhibit C** (the "**Proposed Distribution Order**"). In addition, the Debtors request that the Court authorize the GUC Trustee to utilize up to $50,000 from the GUC Funds (the "**Holdback**") to pay reasonable

---

[1] These estimates are based on the cumulative total of Schedule F claims—excluding duplicates.

[2] Subject to change through the Claims Resolution Process.

expenses associated with the Claims Resolution Process, the Distribution and any other actions taken pursuant to the Distribution and Dismissal Procedures (the "**Distribution and Dismissal Expenses**").

23. The Debtors request that the Proposed Distribution Order provide that (a) Wells Fargo has the sole authority to prosecute and settle the Excluded Insider Actions and any other causes of action other than Avoidance Actions, and (b) Wells Fargo's insurance unit, Wells Fargo Insurance Services, Inc., has the sole authority to resolve any claims under the Debtors' insurance policies with Old Republic pursuant to the Insurance Stipulation and to settle any workers' compensation claims.

24. The Debtors also request that the Proposed Distribution Order provide that, from and after the date of the order ultimately entered, none of the Debtors, nor the Committee, nor any of the Debtors' and the Committee's respective present or former directors, officers, employees, members, attorneys, consultants, advisors and agents (acting in such capacity), shall have or incur any liability to any person for any act taken or omitted to be taken in connection with or related to the formation, preparation, dissemination, implementation, confirmation or consummation of this Motion (other than an action in contravention of this Motion or the implementation of the order ultimately entered on the Motion), or any contract, instrument, release or agreement or document created or entered into, or any other act taken or omitted to be taken in connection with this Motion or the order ultimately entered on the Motion.

25. The Debtors propose to commence the Claims Resolution Process by serving all persons and entities that the Debtors believe have, or potentially have, general unsecured claims against the Debtors' estates (collectively, the "**Potential Claimants**") with a notice, substantially in the form attached hereto as <u>Exhibit A</u> (the "**Proposed Distribution and**

**Dismissal Notice**") within five business days after entry of any order approving this Motion. As set forth on the attached Exhibit A, the Proposed Distribution and Dismissal Notice will, among other things:

- provide general case information, including the estimated amount of the anticipated distribution;

- include a separate schedule with the Potential Claimant's claim information, including the proposed claim amount and whether the claim is disputed, contingent or unliquidated;

- give instructions for filing an objection to the Proposed Distribution and Dismissal Notice, including the mailing address for the Debtors' claims and noticing agent and the objection deadline;[3] and

- include contact information in the event the Potential Claimant has questions regarding the Claims Resolution Process or requires hard copies of claim forms or related court documents.

26. Because the GUC Funds are limited, the Debtors do not anticipate an extensive claims reconciliation process. If a Potential Claimant or other party-in-interest (a) disputes any claim information contained in the Proposed Distribution and Dismissal Notice or (b) wishes to assert a claim that is not reflected on the Proposed Distribution and Dismissal Notice, such Potential Claimant or other party-in-interest (the "**Objecting Party**") shall be encouraged to contact the GUC Trustee informally and resolve its claim or objection amicably, without the need to file a claim or objection formally, as provided in the following paragraph.

27. If an Objecting Party wishes to file a claim or objection formally, the Objecting Party must mail, fax or email its claim or objection with documentation supporting its claim or objection (each a "**Claim Objection**") on or before May 15, 2009 (the "**Objection**

---

[3] Certain creditors and potential creditors have been exempted from the claim filing requirement, including: (a) those who agree with the identified amount of undisputed, noncontingent and liquidated claims; (b) creditors whose claims have been satisfied; (c) claimants whose claims are based solely on ownership of stock in one of the Debtors; (d) former directors and officers holding claims for indemnity or contribution; and (e) any Debtor holding a claim against another Debtor.

**Deadline**") to the GUC Trustee at ACL Adjustment Associates, Inc., 165 Central Avenue, P.O. Box 442, Hasbrouck Heights, NJ 07604-0442 (Email: TLabrosciano@aclcollect.com; Facsimile: (201) 288-7455). In any Claim Objection, the Objecting Party must state the grounds with particularity.

28. The GUC Trustee and counsel to the Committee shall review all Claim Objections and supporting documentation timely submitted by an Objecting Party and consult with the Objecting Party in order to attempt to resolve any disputes regarding the Claim Objection. If the GUC Trustee, counsel to the Committee and the Objecting Party cannot agree on a resolution, then counsel to the Committee shall notice the matter for hearing for ultimate determination by the Court, which hearing shall take place on or before May 29, 2009. Any claim allowed pursuant to the foregoing Claims Resolution Process shall be deemed an "Allowed Unsecured Claim." Additionally, the Debtors seek a determination by the Court that any Potential Claimant or other party-in-interest that does not timely file a Claim Objection shall be barred from challenging the relief requested herein.

B. **The Distribution**

29. Upon completion of the Claims Resolution Process, the Debtors propose to make the Distribution to holders of Allowed Unsecured Claims (collectively, "**Allowed Unsecured Claimants**") (*i.e.*, the beneficiaries of the GUC Trust). For administrative convenience and to conserve expenses, the Debtors propose making only a single distribution of the GUC Funds, and request authority to refrain from making any *de minimis* distribution that would result in a distribution of less than $50 to an Allowed Unsecured Claimant. In addition, the Debtors request that any distributed check(s) that have not been claimed and/or cashed within 90 days after distribution of the check (the "**Check Cashing Period**") be deemed void, and the corresponding claim be disallowed. Furthermore, the Debtors request that any GUC Funds that

remain after expiration of the Check Cashing Period be used to pay Distribution and Dismissal Expenses that exceed the Holdback, if any, and, thereafter, to be donated to a recognized charitable organization that (a) has no affiliation with the GUC Trustee or estate professionals and (b) is acceptable to both the GUC Trustee and counsel to the Committee.

### C. The Certification of Counsel and Request for Dismissal

30. Finally, after completion of the Distribution, the Debtors request dismissal of the Debtors' chapter 11 cases upon the filing of a certification of counsel and request for entry of a dismissal order substantially in the form attached hereto as **Exhibit B** (the "**Certification of Counsel and Request for Dismissal**"). As set forth on the attached Exhibit B, the Certification of Counsel and Request for Dismissal, among other things, will (a) verify that all general unsecured claims have been resolved, (b) identify the amount of all Allowed Unsecured Claims, (c) give the total amount distributed from the GUC Trust and the *pro rata* distribution percentage on account of the Allowed Unsecured Claims and (d) confirm that all Leases have been assumed and assigned or rejected.

### APPLICABLE AUTHORITY

31. The Court should approve the Distribution and Dismissal Procedures because the Debtors (a) are unable to bear the administrative burden of effectuating a plan of reorganization and distributing funds to the Debtors' general unsecured creditors and (b) have no remaining estate assets to administer.

32. Under section 1112(b) of the Bankruptcy Code, a court may dismiss a debtor's chapter 11 case "for cause." 11 U.S.C. § 1112(b); In re Albany Partners, Ltd., 749 F.2d 670, 674 (11th Cir. 1984); In re Blunt, 236 B.R. 861, 864 (Bankr. M.D. Fla. 1999). Section 1112(b) of the Bankruptcy Code states, in pertinent part: ". . . on request of any party in interest or the United States trustee or bankruptcy administrator, and after notice and a hearing, the court

may . . . dismiss a case under this chapter . . . for cause . . . ." A determination of cause is made by the court on a case-by-case basis. Albany Partners, 749 F.2d at 674. In addition, the decision to dismiss a case is particularly delegated to the bankruptcy court's sound discretion. See In re Camden Ordinance Mfg. Co. of Arkansas, Inc., 1999 WL 587790, at *2 (Bankr. E.D. Pa. 1999) (citing In re Atlas Supply Corp., 837 F.2d 1061, 1063 (5th Cir. 1988)). Therefore, it is clear that the Court is authorized to dismiss the Debtors' chapter 11 bankruptcy cases upon a showing of "cause."

33. The legislative history of section 1112(b) of the Bankruptcy Code and relevant case authority indicate that a court has wide discretion to use its equitable powers to dispose of a debtor's case. H.R. Rep. No. 595, 95th Cong., 1st Sess. 405 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978), reprinted in 1978 U.S.C.C.A.N. 57878; see also In re Preferred Door Co., 990 F.2d 547, 549 (10th Cir. 1993) (stating a court has broad discretion to dismiss a bankruptcy case); In re Sullivan Cent. Plaza I, Ltd., 935 F.2d 723, 728 (5th Cir. 1991) (stating that determination of whether cause exists under section 1112(b) of the Bankruptcy Code "rests in the sound discretion" of the bankruptcy court); In re Koerner, 800 F.2d 1358, 1367 & n. 7 (5th Cir. 1986) (stating that a bankruptcy court is afforded "wide discretion" under section 1112(b) of the Bankruptcy Code); Albany Partners, 749 F.2d at 674 (same).

34. Section 1112(b) of the Bankruptcy Code provides a nonexclusive list of ten grounds for dismissal. 11 U.S.C. § 1112(b)(1)-(10); Frieouf v. U.S., 938 F.2d 1099, 1102 (10th Cir. 1991) (stating that section 1112(b) of the Bankruptcy Code's list is nonexhaustive); Blunt, 236 B.R. at 864 (same). One such ground is where a party-in-interest shows that there is

an "inability to effectuate a plan [of reorganization]."[4] 11 U.S.C. § 1112(b)(2); Preferred Door Co., 990 F.2d at 549; Sullivan Cent. Plaza I, 935 F.2d at 728. Here, the Court may dismiss the Debtors' chapter 11 bankruptcy cases because the Debtors are unable to effectuate a plan. 11 U.S.C. § 1112(b)(5).

35. Inability to effectuate a plan arises when a debtor lacks the capacity to "formulate a plan or carry one out" or where the "core" for a workable plan of reorganization "does not exist." See Preferred Door, 990 F.2d at 549 (quoting Hall v. Vance, 887 F.2d 1041, 1044 (10th Cir. 1989)) (finding an inability to effectuate a plan arises where debtor lacks capacity to formulate a plan or carry one out); Blunt, 236 B.R. at 865 (finding cause to dismiss debtor's case under section 1112(b)(2) of the Bankruptcy Code where "core" for a workable plan of reorganization found to be nonexistent).

36. Here, it is simply not possible or practical to effectuate a plan of reorganization because the Debtors have liquidated their assets and have no funds or unencumbered assets to pay any outstanding or accrued administrative expenses. All of the Debtors' inventory has been sold, and the Debtors no longer have any retail stores. As such, there is no business to reorganize. By continuing in bankruptcy, the Debtors could incur additional administrative expenses beyond their ability to pay. In sum, the Debtors have met their burden of proof to show that cause exists to dismiss the Debtors' chapter 11 bankruptcy cases under section 1112(b) of the Bankruptcy Code due to the inability to effectuate a plan of reorganization.

---

[4] In addition to the Debtors, the Committee is a party-in-interest in the Debtors' chapter 11 proceedings. 11 U.S.C. § 1109(b); In re Piper Aircraft Corp., 244 F.2d 1289, 1303 n.11 (11th Cir. 2001) (finding that a creditors' committee is a party in interest in a chapter 11 bankruptcy proceeding).

37.     Once a court determines that cause exists to dismiss a chapter 11 case, the court must also evaluate whether dismissal is in the best interests of the creditors and of the estate. See In re Superior Sliding & Window, Inc., 14 F.3d 240, 243 (4th Cir. 1994); In re Mazzocone, 183 B.R. 402, 411 (Bankr. E.D. Pa. 1995), aff'd 200 B.R. 568 (E.D. Pa. 1996); In re Warner, 83 B.R. 807, 809 (Bankr. M.D. Fla. 1988). A variety of factors demonstrate that it is in the best interest of the creditors and the Debtors' estates to dismiss the chapter 11 cases and authorize distribution of the GUC Funds to the Debtors' general unsecured creditors, as contemplated by the Motion.

38.     Among other things, a dismissal of a chapter 11 bankruptcy case meets the best interests of the creditors test where a debtor has nothing to reorganize and the debtor's assets are fixed and liquidated. See In re BTS, Inc., 247 B.R. 301, 310 (Bankr. N.D. Okla. 2000); In re Camden Ordinance Mfg. Co. of Arkansas, Inc., 245 B.R. 794, 799 (E.D. Pa. 2000) (finding that a reorganization to salvage business which ceased business was unfeasible); In re Brogdon Inv. Co., 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982) (dismissing a chapter 11 bankruptcy proceeding in part where there was "simply nothing to reorganize" and no reason to continue the reorganization).

39.     As explained above, the Debtors have nothing left to reorganize. As of the date of this Motion, virtually all of the Debtors' assets have been liquidated. The only significant remaining task is for the GUC Trustee and counsel to the Committee to distribute GUC Funds, which funds are not property of the Debtors' estates by virtue of the DIP Order. See Transcript, March 27, 2008, p. 55, lines 19-23 (overruling objection of U.S. Trustee in connection with proposed DIP financing, on grounds that GUC Trust was not property of the estates); see also In re SPM Mfg. Corp., 984 F.2d 1305 (1st Cir. 1993) (holding a secured

creditor may share proceeds it is otherwise entitled to receive with unsecured creditors); In re MCorp. Fin., Inc., 160 B.R. 941 (S.D. Tex. 1993) (holding senior creditor may share its proceeds with specified junior creditors so long as junior creditors not receiving distribution receive at least as much as they would in a hypothetical chapter 7 without the sharing); In re World Health Alternatives, Inc., 344 B.R. 291 (Bankr. D. Del. 2006) (holding a secured creditor may carve out funds from its collateral for the benefit of unsecured creditors in exchange for committee's withdrawal of its objection to motion to sell substantially all of debtor's assets); In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001) (holding that secured lender's distribution to management did not preclude confirmation of the plan). Thus, dismissal of the Debtors' chapter 11 cases is in the best interest of the creditors because the Debtors' operations no longer exist, and the GUC Funds are immediately available for distribution to the Debtors' general unsecured creditors.

40. In addition, dismissal is proper because the alternative—conversion to chapter 7—is impractical. One element of the best interest of the "estate" focuses upon whether the economic value of the estate is greater inside or outside of bankruptcy. In re Clark, 1995 WL 495951, at 5 (N.D. Ill. 1995); In re Staff Inv. Co., 146 B.R. 256, 261 (Bankr. E.D. Cal. 1993). The prime criterion for assessing the interests of the estate is the maximization of its value as an economic enterprise. See id. Here, dismissal of the Debtors' cases will maximize the value of the Debtors' estates because conversion to a chapter 7 liquidation and appointment of a trustee would impose significant and unnecessary additional administrative costs upon the Debtors' estates. Dismissal of the Debtors' chapter 11 bankruptcy cases is preferred in this instance because the Debtors do not have any significant remaining duties, and the GUC Trustee and

counsel to the Committee have only one remaining relatively simple administrative duty—distribution of the GUC Funds to the Allowed Unsecured Claimants.

41. The Distribution and Dismissal Procedures represent the parties' cooperative efforts at reaching a solution that benefits all of the creditors within the confines of the Bankruptcy Code. Authorizing distribution of the GUC Funds and allowing dismissal of the Debtors' bankruptcy cases simply furthers the Bankruptcy Code's goal of efficient administration of the Debtors' bankruptcy estates to maximize the return to general unsecured creditors.

## NOTICE

42. Notice of this Motion will be given to (a) the United States Trustee for the District of Delaware, (b) counsel to Wells Fargo, (c) counsel to Ableco Finance LLC, (d) counsel to the Committee (e) counsel to equity holders, (f) all creditors and (g) parties that have requested service of papers pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that no other or further notice is required.

## NO PRIOR REQUEST

43. No prior request for the relief sought in this Motion has been made to this or to any other Court.

[SIGNATURE ON NEXT PAGE]

WHEREFORE, the Debtors respectfully request that this Court enter an Order (a) approving the Distribution and Dismissal Procedures, as set forth in the Proposed Distribution Order and (b) granting such other and further relief as this Court deems just and proper.

Dated: March 23, 2009

> Respectfully submitted,
>
> GREENBERG TRAURIG LLP
>
> _____
> Dennis A. Meloro (DE Bar No. 4435)
> The Nemours Building
> 1007 North Orange Street, Suite 1200
> Wilmington, DE 19801
> Telephone: (302) 661-7000
> Facsimile: (302) 661-7360
> Email: melorod@gtlaw.com
>
> -and-
>
> Nancy A. Peterman
> Ethan Ostrow
> 77 West Wacker Drive, Suite 3100
> Chicago, IL 60601
> Telephone: (312) 456-8400
> Facsimile: (312) 456-8435
> Email: petermann@gtlaw.com
>       ostrowe@gtlaw.com
>
> -and-
>
> Paul J. Keenan
> 1221 Brickell Avenue
> Miami, FL 33131
> Telephone: (305) 579-0500
> Facsimile: (305) 579-0717
> Email: keenanp@gtlaw.com
>
> Counsel for the Debtors and Debtors-In-Possession